# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### AUGUSTA DIVISION

ANA M. ABREU-VELEZ,       *
M.D., Ph.D.,             *
                           *
       Plaintiff,        *
                           *
       v.                *         CV 105-186
                           *
BOARD OF REGENTS OF THE    *
UNIVERSITY SYSTEM OF GEORGIA, *
that created and operates   *
the Medical College of      *
Georgia, MEDICAL COLLEGE     *
OF GEORGIA, and DENNIS       *
MARCUS, M.D., individually   *
and in his official capacity  *
under color of law as former  *
head of Department of        *
Ophthalmology of the Medical  *
College of Georgia,         *
                           *
       Defendants.       *

---

# O R D E R

---

     Plaintiff Ana M. Abreu-Velez, M.D. filed the captioned case bringing claims under 42 U.S.C. § 1983 ("§ 1983") and the Georgia Whistleblower Act, O.C.G.A. § 45-1-4 (2004), asserting that Defendants retaliated against her for exercising her First Amendment right of free speech by unlawfully terminating her and refusing to rehire her for a number of jobs. This matter comes before the Court

pursuant to Defendants' Motion for Summary Judgment under Federal Rule of Civil Procedure 56(c). (Doc. no. 43.) Upon consideration of the record evidence, the briefs submitted by counsel, and the relevant law, Defendants' motion is **GRANTED** for the reasons stated below.

## I.    BACKGROUND

Plaintiff's § 1983 claim against Defendants stems from her employment in the Department of Ophthalmology at Medical College of Georgia ("MCG") from August 4, 2004 to November 22, 2004. The Court notes that Plaintiff brings a First Amendment retaliation claim. Thus, the Court will concern itself with Plaintiff's speech while she was an employee at MCG and shortly thereafter. Plaintiff makes a litany of allegations against MCG including, but not limited to: a pattern of misconduct in clinical trials; MCG employees receiving illicit funds through conducting clinical trials; endangerment of human lives during these clinical trials; orchestrating physical attacks on Plaintiff's daughter; bribing Plaintiff's former attorney; money laundering through false bankruptcies; tax evasion; as well as violations of the Patriot Act. The Court makes clear at the outset that Plaintiff's unsubstantiated allegations of past and present wrongdoing against MCG are

2

simply not relevant in determining whether Dr. Marcus and other officials at MCG fired Plaintiff in retaliation for exercising her First Amendment rights, or continued to retaliate against her after her termination.

### A. Plaintiff's Employment with Dr. Marcus at the Department of Ophthalmology

#### i. Plaintiff's Work History

Plaintiff is a citizen of Colombia, South America, where she was trained as a medical doctor. Plaintiff holds a degree in dermatology and a Ph.D. in immunology. (Pl. Dep. at 20-26.) Plaintiff worked at the University of Antioquia Medical School in Colombia until she was fired in February 2001, allegedly for revealing fraud at the university. (Id. at 64-70; Pl. Dep. Ex. 1.)

In October 2001, Plaintiff was initially hired at MCG as a Post Doctoral Fellow, working for Drs. Mellor and Munn at the Institute of Molecular Medicine and Genetics. Plaintiff stayed at this position until March 2002, when she was transferred to another laboratory. (Id. at 39-41.) Plaintiff alleges that she was transferred to this position because she "showed misconduct in research performed by Dr. Andrew Mellor and David Munn." [1] (Id. at 39.)

---

[1] Plaintiff's current suit does not involve allegations against Drs. Mellors and Munn.

3

Next, Plaintiff was transferred to work under Dr. Wendy Bollag as an Assistant Research Scientist. (Pl. Dep. Ex. 1.) Plaintiff worked in that capacity until June 30, 2004, when her contract was not renewed because Dr. Bollag did not receive a grant to reemploy her. (Pl. Dep. at 44-46.)

## ii. Plaintiff's Job Responsibilities

Plaintiff was hired to work as a research associate in the Department of Ophthalmology at MCG on August 4, 2004. (Pl. Dep. Ex. 5.) Specifically, Plaintiff was employed as a clinical trials compliance coordinator and research associate. (Aff. of Pl. ¶ 7.) Plaintiff worked for Dr. Marcus, who at the time was the head of the Department of Ophthalmology. (Marcus Dep. at 75; Aff. of Marcus ¶¶ 13-14.) Dr. Marcus was Plaintiff's direct supervisor. (Id.) Plaintiff was also supervised by Dr. Judy Hendrickson, another faculty member in the department, as well as Ms. June Benson, the senior clinical coordinator. (Id. ¶ 9.)

The Department of Ophthalmology conducts many clinical research trials. Plaintiff was hired to help Dr. Marcus conduct his trials in compliance with record keeping and reporting requirements. (Pl. Dep. at 77-89; Aff. of Marcus at ¶¶ 15-17). Plaintiff's primary job responsibility was to "coordinate clinical trial research and perform all aspects

4

of patient care related to specific trials." (Pl. Dep. Ex. 7.) Specifically, Plaintiff's written job duties included: coordinating clinical trial research by preparing human assurance protocols and consents; performing data entry in compliance with various federal laws and sponsor-required guidelines; acting as a patient liaison; certifying and assisting with specialized patient diagnostic and therapeutic procedures; supporting and communicating appropriately with all medical staff; compiling new budgets, including coordination with MCG Grants and Contracts office; and tracking and reporting all budgets and spending. (Id.; Pl. Dep. at 95-103)

Plaintiff had more specific duties as well. In Plaintiff's own words, she "ke[pt] the books, No. 1." (Pl. Dep. at 78.) Plaintiff was responsible for maintaining the regulatory folders, including patient consent forms and other mandatory documents required for conducting clinical research trials. (Id.; Marcus Dep. at 39, 62-63, 70-71, 86.)

Plaintiff testifies that protecting the safety of the people used in clinical trials was an important part of her position. Plaintiff was required to communicate with the Institutional Review Board that protects human subjects used in clinical trials. (Pl. Dep. at 79.) Plaintiff also

worked with the Human Assurances Committee to ensure the safety of humans being used in the clinical trials. (Id. at 97.) Plaintiff testified that it was "absolutely" part of her job duties to "protect humans used in the clinical trials." (Id. at 84.)

### iii. Plaintiff's Internal Complaints During Her Tenure

When Plaintiff began to work for Dr. Marcus, she was dismayed to find that the clinical trials files were in serious disorder. (Aff. of Pl. ¶ 10; Marcus Dep. at 62-63.) Specifically, Plaintiff recognized a number of serious violations of good clinical practices in various studies. (Aff. of Pl. ¶ 10.) For instance, Plaintiff found that in Dr. Marcus's Sleep Apnea study, almost one-hundred patients had not signed the proper informed consent paperwork. (Id. ¶ 15.) In another study sponsored by Eli Lilly, Plaintiff found evidence that some patients had suffered severe reactions and adverse events ("SAEs") during clinical trials and that these SAEs had gone unreported. (Id.)

Based on her concerns, Plaintiff first reported these violations to Dr. Marcus, to Benson, and to Dr. Hendrickson. (Id. ¶ 12.) In Plaintiff's own words, she talked to Dr. Marcus about the following problems: conflicts of interest, questionable budgets, inadequacies

in the consent forms given to study participants, as well as failure to report severe adverse events, serious accounting issues, non-compliance in maintaining regulatory folders, and failure to report bonuses and incentives for the studies. (Id. ¶ 19.) Plaintiff contends that both Benson and Dr. Marcus reacted in anger to her concerns. (Id.)

When Plaintiff was unsatisfied with their inaction, she reported her concerns to the Office of Clinical Trials Compliance ("OCTC"). (Id. ¶ 15.) The Office of Clinical Trials has the authority to conduct audits of clinical research trials at MCG. (Dep. of Taylor at 17.) Based on Plaintiff's concerns, Bridgett Taylor, a clinical trials auditor, conducted an audit of Dr. Marcus's Sleep Apnea study. (Id. at 21.) Specifically, Taylor was concerned about the informed consent forms missing from the study. (Id. at 23.) After the audit was conducted, the OCTC informed Dr. Marcus that the lack of informed consent forms made the data collected in the study unusable. (Id.)

Plaintiff also contends that she reported Dr. Marcus's violations to Dr. Julian Nussbaum, the Director of the Ophthalmology Department, and Lori Mipro, the Department of Ophthalmology Administrator, as early as October 8, 2004. (Pl. Dep. at 144; Aff. of Pl. ¶ 22.) In response to the

7

concerns raised by Plaintiff, Dr. Nussbaum organized a weekly obligatory meeting with him and all of Dr. Marcus's staff to discuss these issues. (Aff. of Pl. ¶ 22.)

Throughout Plaintiff's tenure at MCG, Dr. Marcus contends that he had no knowledge of Plaintiff's various allegations against him. (Aff. of Marcus ¶¶ 40-44; Marcus Dep. Vol. I at 52, 78; Vol. II. at 31-32, 85.) Dr. Marcus did not become aware of Plaintiff's accusations until December 2004. (Aff. of Marcus ¶ 40.)

### iv. Plaintiff's Working Relationship with Dr. Marcus

By both Plaintiff and Dr. Marcus's accounts, the working relationship between Plaintiff and Dr. Marcus was strained. In Marcus's view, Plaintiff displayed behavior that was bizarre, unprofessional, and unproductive. (Marcus Dep. at 68-72.) Plaintiff was ineffective and unproductive in her job because she would "split hairs" and "obsess about irrelevant details." (Marcus Dep. at 70-71, 86.)

Plaintiff would interrupt Dr. Marcus and Dr. Hendrickson during patient appointments. (Marcus Dep. at 68-69; Pl. Dep. at 235-36.) While Plaintiff was permitted to interrupt Dr. Marcus for emergency situations, Plaintiff

would interrupt Dr. Marcus with trivial administrative problems. (Marcus Dep. at 69.)

Dr. Marcus found that Plaintiff improperly handled a variety of administrative tasks including: incorrectly handling a laser repair job (Pl. Dep. Ex. 12); bringing boxes into the library (Pl. Dep. at 139); and incorrectly ordering offices supplies. (Id.) Drs. Marcus and Henrickson met with Plaintiff to discuss her shortcomings in these administrative tasks. (Pl. Dep. at 139, 141-43, 235-37.)

On October 14, 2004, Plaintiff wrote Dr. Marcus to explain that she could not handle sharing a work space with Melanie, a co-worker. (Pl. Dep. at 132-34, Pl. Dep. Ex. 11.) Specifically, Plaintiff complained that she could not handle Melanie's "strong laghes [sic]" and her multiple intercom pages. (Id.) Both Dr. Marcus and Dr. Hendrickson found her reaction to sharing workspace to be inappropriate. (Dep. of Marcus at 68-69; Aff. of Marcus ¶¶ 30-31.)

Likewise, Plaintiff admits she was unhappy in her position in the Department of Ophthalmology. (Pl. Dep. at 128.) In fact, in October 2004, Plaintiff sought out other forms of employment. (Id.) Plaintiff's need to care for her daughter was related to her desire to look for another job. On October 19, 2004, Plaintiff wrote an email to Dr.

Marcus, asking to be removed as a technician on the Genetech study because she did not want to leave her daughter alone. (Pl. Dep. Ex. 15.) Plaintiff suggested that if it was not possible to remove her from the study, she would start applying to other jobs. (Id.)

On October 20, 2004, Plaintiff wrote to Dr. Marcus that she was very stressed out and needed to take a day off. (Pl. Dep. Ex. 16.) In her email, she suggests that her daughter is ill and needs a lot of attention, care, and "mommy made food." (Id.) Plaintiff reiterates that she is not the right person for this job. (Id.)

On November 4, 2004, Plaintiff wrote an email to Dr. Nussbaum, informing him that she was beginning to apply for other positions at MCG. (Pl. Dep. Ex. 38.) Plaintiff requested that she be able to list Dr. Nussbaum as a reference. (Id.) Plaintiff cites her reasons for wanting to leave the employ of Dr. Marcus as "terrible disorganization, very bad salary, and it will require[d] a lot of time and patient (sic) to fix so many things pending over years." (Id.)

### v. MCG's Termination of Plaintiff

In Dr. Marcus's view, Plaintiff was terminated as a result of her behavior in scheduling a pre-enrollment visit

for a clinical trial. In mid November of 2004, Dr. Marcus expected to have a visit from Theragenics, a sponsor for some of the Department's clinical trials, to determine whether the Department would be an appropriate place for a clinical trial involving the use of radiation. (Aff. of Marcus ¶¶ 33-37.) Plaintiff believed that the Theragenics visit could threaten the safety of the patients and staff and she informed individuals in the hospital that she would not allow the visit to take place. (Id.) Because of Plaintiff's strong opposition to the Theragenics visit, Benson had to take charge of organizing the visit. (Pl. Dep. Ex. 20.)

On November 18, 2004, Dr. Marcus and Dr. Hendrickson decided that Plaintiff was failing in her job as a research coordinator. As a result, on November 19, 2004, Mipro, the Department Administrator, orally notified Plaintiff that her employment would be terminated effective on November 22, 2004. Plaintiff recalls that Mipro told her she was fired "because you opened your mouth." (Pl. Dep. at 167-68.) Mipro provided Plaintiff with formal notice of discharge on November 19, 2004. (Pl. Dep. Ex. 23.) According to the dismissal notice, Plaintiff was terminated

because of her failure to satisfactorily complete the six-month provisional period. [2] (Id.)

## B. Plaintiff's Post-Termination Speech

Shortly after Plaintiff's termination, she began making complaints to various MCG officials about Dr. Marcus's clinical trials. On November 23, 2004, Plaintiff sent an email to Dr. Nussbaum, requesting that MCG conduct audits of Dr. Marcus's clinical trials. (Pl. Dep. Ex. 32.) Specifically, she alleged that during her employment, she had observed research misconduct, irresponsible conductance of clinical trials, and negligence. (Id.) In fact, before sending this email to Dr. Nussbaum, she sent drafts of this email to various employees of MCG so that they could proofread it for her. (Pl. Dep. Exs. 26-30.) In response, Dr. Nussman told Plaintiff that he forwarded her email to the appropriate individuals for follow up investigation. (Pl. Dep. Ex. 32.)

On January 4, 2005, Solomon Walker, Director of the AA/EEO Office at MCG, informed Plaintiff that Human Resources would be handling her complaints since they were employment related. (Pl. Dep. Ex. 43.) On January 28, 2005,

---

[2] Plaintiff contends that she was not a probationary employee because she had been working in various laboratories and departments at MCG since October 2001. (Aff. of Pl. ¶ 8.) Defendants respond that Plaintiff's allegation is completely unsupported by the evidence. (Defs.' Reply Br. at 2.)

the Director of Human Resources, Susan A. Norton, informed Plaintiff that she was fired, not in retaliation for making allegations against Dr. Marcus, but for the failure to satisfactorily complete the provisional period. (Pl. Dep. Ex. 33.)

Although Human Resources had determined that Plaintiff was not fired in retaliation for making allegations against Dr. Marcus, in December 2004, Plaintiff began to communicate via email with Andrew Newton, the Vice President of Legal Affairs at MCG. (Pl. Dep. Ex. 49.) In her emails, Plaintiff began to voice various allegations not only against Dr. Marcus, but also Drs. Mellor and Munn, with whom she had worked previously. (Pl. Dep. Ex. 39.) Plaintiff believed she had witnessed "a pattern of research misconduct and wrongdoing in clinical trials over a ten year period and MCG's willingness to ignore it." (Aff. of Pl. ¶ 4.) During this time, Plaintiff made extreme allegations such as: that MCG was embezzling money to support terrorist operations; that MCG employees filed false bankruptcies to launder money; that MCG had orchestrated physical attacks on her daughter and had attempted to intimidate her; that MCG was tapping her phone calls in violation of the Patriot Act; and that MCG bribed her former attorney to botch her case. (Pl. Dep. at 317-

18, 344-45, 431-38.)  In many of these emails, Plaintiff refers to "clues" that, to her mind, demonstrate various wrongdoing by officials at MCG; however, these "clues" do not present specific evidence.[3]  (Pl. Ex. 43, 46-47, 50-52, 57-58, 67, 69, 72, 77.)

Plaintiff also told both Dr. Rhan, the President of MCG, and Newton that unspecified officials at MCG were interfering with the hiring process to prevent her from getting a new position with MCG. (Pl. Dep. Ex. 53.)  Newton repeatedly asked her to provide him with specific evidence that such retaliation had occurred, but Plaintiff did not do so. (Id.)

Plaintiff also asked that both Newton and Dr. Rhan place her in a position at MCG with at least two years' job security.  Newton explained to Plaintiff that she was certainly welcome to apply for any jobs for which she was qualified, but that Dr. Rhan and Newton were not willing to interfere with the hiring process of individual departments and laboratories. (Id.)

Beginning in the summer of 2006, Plaintiff began to contact federal agencies and organizations to inform them

---

[3] For example, Plaintiff provided Newton with a greeting card that she had given to a former employer in 2002. Plaintiff put this card into a plastic bag to preserve any fingerprints for testing. Plaintiff did not explain how this greeting card demonstrated any wrongdoing by Dr. Marcus or any of her former employers at MCG. (Pl. Dep. at 284-88; Ex. 44.)

of the alleged wrongdoing occurring at MCG. On July 20, 2006, Plaintiff contacted the FBI believing that MCG was involved in orchestrating a physical attack on her daughter. (Pl. Dep. Ex. 80.) She asked the FBI to put her in the witness protection program because she was afraid MCG was trying to harm her. (Pl. Dep. Ex. 91.) On July 26, 2006, Plaintiff sent a letter to the Honorable Dudley H. Bowen, Jr., United States District Judge, informing him of wrongdoing by MCG. (Id.) Plaintiff continued to contact a variety of federal agencies through the spring of 2007, including: the Internal Revenue Service; the Department of Health and Human Services; the U.S. Office of the Director of National Intelligence; the Securities and Exchange Commission; the Department of Justice; the Department of Homeland Security; the Veterans Administration, the Drug Enforcement Agency; the Department of Education; and the U.S. Joint Commission. (Pl. Dep. Exs. 81, 82, 85, 86, 89, 90; Howard Dep. at 58-62, 66-67.)

Plaintiff claims that she has applied for over 130 jobs at MCG for which she was qualified, but has not been offered a position. (Aff. of Pl. ¶ 30.) Plaintiff does not identify the specific jobs for which she applied. Plaintiff stopped applying for MCG jobs in late summer of 2005. (Id.)

Plaintiff contends that she was not given a job in retaliation for her post-termination speech to various MCG officials as well as to federal and state agencies. Plaintiff states that "I am qualified for many of the positions for which I applied at MCG following my termination, and the failure to be offered a single job at MCG is unquestionably retaliatory for my whistleblowing activities while employed at MCG and following my termination." (Aff. of Pl. ¶ 32.)

## II. <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is appropriate when there are no genuine issues of fact and the movant is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56(c). The purpose of the summary judgment rule is to dispose of unsupported claims or defenses which, as a matter of law, raise no genuine issues of material fact suitable for trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). In considering a motion for summary judgment, all facts and reasonable inferences are to be construed in favor of the nonmoving party. <u>Hogan v. Allstate Ins. Co.</u>, 361 F.3d 621, 625 (11th Cir. 2004). The party opposed to the summary judgment motion, however, "may not rest upon the mere allegations or denials in its

pleadings. Rather, its responses . . . must set forth specific facts showing that there is a genuine issue for trial." Walker v. Darby, 911 F.2d 1573, 1576-77 (11th Cir. 1990). Summary judgment is not appropriate "if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In response to Defendants' motion for summary judgment, the Clerk issued a Griffith[4] notice on May 12, 2008. (Doc. no. 52.)

## III. DISCUSSION

In this case, Plaintiff contends that her First Amendment retaliation claim has two parts. First, Plaintiff contends that Defendants terminated her in retaliation for voicing her concerns about Dr. Marcus's clinical trials. Second, Plaintiff contends that MCG refused to hire her for any of the over 130 jobs for which she applied and was qualified in retaliation for the complaints she made after she was terminated.

It is well established that government regulation of a public employee's speech is different from government regulation of the speech of its citizens. Boyce v. Andrew,

---

[4] Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam).

17

510 F.3d 1333, 1342 (11th Cir. 2007) (citing Connick v. Meyers, 461 U.S. 138, 140 (1983); Pickering v. Board of Educ., 391 U.S. 563 (1968)). Thus, these two types of speech warrant different analysis. The Court will first examine Plaintiff's speech as a public employee and then turn to Plaintiff's speech as a citizen, that is, post-termination.

### A.    Plaintiff's Claim as a Public Employee

Plaintiff claims that Defendants terminated her employment in retaliation for her allegations against Dr. Marcus in violation of § 1983. When a citizen enters government service, the citizen "must accept certain limitations on his or her freedom." Garcetti v. Ceballos, 547 U.S. 410, 419 (2006). When the government is acting as an employer, it is afforded broad discretion in its employment decisions. Boyce, 510 F.3d at 1341. Like private employers, government employers "need a significant degree of control over their employee's words and actions; without it, there would be little chance for the efficient provision of public services." Garcetti, 547 U.S. at 418. Thus, the Supreme Court has restricted the protections of the First Amendment afforded to government employees. Boyce, 510 F.3d at 1342.

In the decisions of Connick v. Meyer and Pickering the Court established that for government employee speech to be protected by the First Amendment, the employee must have (1) spoken as a citizen, and (2) addressed matters of public concern. Boyce, 510 F.3d at 1341. The Supreme Court later clarified its precedent by holding that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." Garcetti, 547 U.S. at 421; see also Boyce, 510 F.3d at 1342-43 (If an employee speaks pursuant to official duties, there is no constitutional protection . . .).

Following Garcetti, the Eleventh Circuit has instructed district courts to determine first whether the employee spoke pursuant to her official duties. Boyce, 510 F.3d at 1342-43. If the government employee was speaking pursuant to her official duties, she is speaking as an employee and not a citizen and her retaliation claim fails.

In the instant case, the Court concludes that Plaintiff's speech is not constitutionally protected because she spoke as a government employee and not as a citizen. In Garcetti, the Supreme Court held that the deputy district attorney was not speaking as a citizen when

he wrote a memo recommending that a case be dismissed, and was subsequently subjected to a series of retaliatory employment actions. The Court found that the controlling factor was that the deputy district attorney's speech was made pursuant to his duties. Id. at 421. Indeed, the Court wrote:

> Ceballos wrote his disposition memo because that is part of what he, as a calendar deputy, was employed to do. It is immaterial whether he experienced some personal gratification from writing the memo; his First Amendment rights do not depend on his job satisfaction.

> Id.

The Eleventh Circuit decision in Battle v. Board of Regents, 468 F.3d 755 (11th Cir. 2006) is instructive on this point. In Battle, the plaintiff worked in the Office of Financial Aid and Veteran Affairs at Fort Valley State University. The plaintiff admitted she had a "clear employment duty to ensure the accuracy and completeness of student files as well as to report any mismanagement or fraud she encountered in the student financial aid files." Id. at 761. During the course of her employment, the plaintiff discovered improprieties pointing to her supervisor's "fraudulent mishandling and mismanagement of Federal financial aid funds." Id. at 758. She confronted her employer, but he refused to address her concerns. Id.

The plaintiff also provided the Fort Valley State University President with evidence of this fraud. Id. According to the plaintiff, she was subjected to retaliation for bringing these concerns to light.

The Eleventh Circuit affirmed summary judgment for the defendants. The court held that "because the First Amendment protects speech on matters of public concern made by a government employee speaking as a citizen, not as an employee fulfilling official responsibilities, Plaintiff's retaliation claim must fail." Id. at 761.

Similarly, Plaintiff's speech in this case was made pursuant to her official duties while employed at MCG. Throughout the course of her employment, Plaintiff made complaints to Dr. Marcus and Benson, to Dr. Nussbaum and Mipro, as well as to the OCTC. Specifically, she identified problems in Dr. Marcus's studies related to: inadequacies in the consent forms given to study participants; non-compliance in maintaining regulatory folders; questionable budgets and serious accounting issues, including the failure to report bonuses and incentives for the studies; and the failure to report severe adverse events.

Plaintiff's written job description makes clear that she was hired to make sure that data entry for these

clinical trials was performed in compliance with various oversight agencies and organizations and sponsor required guidelines. She was to maintain the regulatory folders and ensure that the proper consent forms were obtained. She was also hired to track and report all budgets and spending for all accounts. These duties align specifically with the complaints she made about Dr. Marcus's clinical trials.

Moreover, Plaintiff admits that her allegations were made as part of her duties, stating in her deposition that "Absolutely, you have to report." (Pl. Dep. at 204-05.) Plaintiff concedes that it was her duty to assure "regulatory compliance" with Dr. Marcus's clinical trials. (Id. at 87.) Plaintiff also states that it was her duty to protect humans involved in Dr. Marcus's clinical trials, specifically, by reporting the failure to obtain informed consent as well as reporting SAEs.

Plaintiff argues that because she reported violations in the Sleep Apnea Study, a trial that was completed prior to her hire date, her speech was made outside of her duty to ensure compliance with record keeping and reporting requirements. However, Plaintiff's written job description denotes that Plaintiff is responsible for "coordinating clinical trials" but does not specify the specific trials for which Plaintiff was responsible. Further, at the time

of Plaintiff's report to OCTC, the data of Dr. Marcus's Sleep Apnea study was still being analyzed. (Dep. of Taylor, Ex. 5.) Thus, the clinical study was still ongoing when Plaintiff assumed her duties.

Plaintiff reported to the OCTC that several informed consent forms were missing, in violation of data entry regulations. As a result of Plaintiff's reports, the data of Dr. Marcus's study could not be validated, and his study was not submitted for publication. Plaintiff fulfilled her written job responsibility by ensuring that the Sleep Apnea's data entry was in compliance with federal guidelines.

Plaintiff's own admissions make it apparent to this Court that her position at MCG required her to ensure that Dr. Marcus's studies were completed in compliance with all federal regulations, that all accounting was proper, and to ensure that humans were protected. Like the plaintiff in Battle, Plaintiff made allegations against Dr. Marcus to fulfill her duties to MCG. Plaintiff's speech made while she was an employee at MCG is not protected by the First Amendment and Plaintiff's retaliation claims fails.[5]

---

[5] Because the Court has determined that Plaintiff's speech was made pursuant to her official duties, Plaintiff was speaking as an employee, not a citizen on a matter of public concern. The Court notes, however, that Plaintiff is also not able to demonstrate that her speech played a substantial part in her subsequent termination. See Boyce, 510 F.3d at

## B. Plaintiff's Speech as a Citizen

The next aspect of Plaintiff's retaliation claim concerns her speech after she was terminated by MCG. Plaintiff contends that after she was fired, she continued to make allegations against Dr. Marcus, both internally to MCG as well as to public agencies. In retaliation for making these allegations, Plaintiff contends that MCG refused to hire her for any of the 130 jobs for which she applied.[6]

Because Plaintiff was acting as a private citizen after November 22, 2004, her post-termination speech is provided more protection. Indeed, the Eleventh Circuit has explained that a private citizen is entitled to <u>at least</u> as much protection against retaliation as a public employee. <u>Bennettv. Hendrix</u>, 423 F.3d 1247, 1252 (11th Cir. 2005) (emphasis added). Indeed, a "public employee . . . may be required to tolerate more than average citizens." <u>Id</u>. at

---

1342-43. Dr. Marcus testifies that he was unaware that Plaintiff was making allegations against him until after her termination. Without specific knowledge that Dr. Marcus was aware of her speech, her retaliation claim would fail. See <u>King v. Augusta</u>, 2008 WL 268913, * 8 (S.D. Ga. January 29, 2008) ("At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took the adverse employment action.").

[6] It appears that Plaintiff also argues that MCG's refusal to hire her for any of these positions was in retaliation for her "whistleblowing activities" while she was an employee at MCG. This claim fails as the Court has already determined that this speech was made pursuant to her official job duties and is not protected under the First Amendment.

1253 (citing Thaddeus-X v. Blatter, 175 F.3d 378, 398 (6th Cir. 1999).

In order for a private citizen to prove a claim for First Amendment retaliation, a plaintiff must show (1) that the speech was constitutionally protected; (2) the plaintiff suffered an adverse action that would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action and the protected speech. Smith v. Mosley, 532 F.3d 1270, 1276 (11th Cir. 2008); see also Bennett v. Hendrix, 423 F.3d 1247 (establishing the elements of a citizen's retaliation claim).

Here, it is uncontested that Plaintiff's speech in reporting alleged wrongdoing by a government entity is constitutionally protected. Further, it has been established that not being rehired for a position is a retaliatory act that would chill a person of ordinary firmness. See Washington v. Bellsouth Commc'ns, 285 Fed. Appx. 597, 601 (11th Cir. 2008) (citing Burlington N. & Sante Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)); Bennett, 423 F.3d at 1253. Plaintiff's claim fails, however, because she is unable to establish a causal connection between her protected speech and MCG's failure to hire her for any of the 130 jobs to which she applied.

In the Title VII employment context, the Eleventh Circuit has provided some guidance for district courts to determine whether a plaintiff has established a causal connection for a retaliation claim.[7] To show that the adverse action was causally related to the employee's protected expression, Plaintiff must prove that "the protected activity and the adverse action are not completely unrelated." <u>Wideman v. Wal-Mart Stores, Inc.</u>, 141 F.3d 1453, 1454 (11th Cir. 1998).

The causal link is interpreted broadly, but the Plaintiff must prove more than the fact that the adverse action occurred sometime after the protected speech. <u>Davis v. Coca-Cola Bottling Co. Consol.</u>, 516 F.3d 955, 978 (11th Cir. 2008) ("merely showing that the alleged adverse action occurred sometime after the protected expression does not establish the causation element – for temporal progression to be enough, the events must be very close in proximity"); <u>see also</u> <u>O'Bryant v. Finch</u>, 2008 WL 4372867, * 7 (N.D. Fl. Sept. 24, 2008) ("A causal connection between the protected conduct and the allegedly retaliatory act *may* be alleged by

---

[7] While the elements for a Title VII retaliation claim are not identical, both causes of action require a causal connection between the protected activity and the retaliatory action. <u>See</u> <u>Adams v. Cobb County Sch. Dist.</u>, 242 Fed. Appx. 616, 619 (11th Cir. 2007).

a chronology of events that create a plausible inference of retaliation.")

The Eleventh Circuit has cautioned, however, that "conclusory allegations without specific supporting facts have no probative value" and that "in the absence of any other evidence of causation," a short period of time between the protected activity and the adverse employment action is insufficient to create a jury issue on causation. Taylor v. Nix, 240 Fed. Appx. 830, 836 (11th Cir. 2007). The Third Circuit has instructed district courts that in the absence of "an unusually suggestive temporal proximity" showing retaliation or a "pattern of antagonism coupled with timing to establish a causal link," a plaintiff must show that "from evidence gleaned from the record as a whole, the trier of fact should infer causation." Queer v. Westmoreland County, 2008 WL 4636497, *3 (3rd Cir. Oct. 20, 2008).

The Court notes that Plaintiff admits she stopped applying for jobs in late summer of 2005. Plaintiff did not begin making reports to federal agencies such as the FBI, the IRS, the FDA, and the DOJ until the spring and summer of 2006. Thus, Plaintiff's reports to outside agencies absolutely cannot be related to MCG's failure to

rehire her, as they occurred after she ceased her job applications.

The Court recognizes, however, that Plaintiff alleges that she was applying for jobs during the same period of time she was making internal complaints to MCG officials. In fact, Plaintiff contends that she applied for over 130 jobs after she was fired. Plaintiff has not provided this Court with any evidence of the specific jobs for which she applied. Plaintiff does not demonstrate how she was qualified for the jobs she was not awarded; only making the blanket statement that she is qualified for many of these unnamed positions at MCG. (Aff. of Pl. ¶ 32.) Plaintiff does not tell the Court the dates she applied for these jobs. Plaintiff does not present evidence of a single job application.

In short, Plaintiff has not demonstrated that there is any sort of temporal connection between her allegations made to various MCG officials and her failure to receive another job at MCG. Such a vague conclusory allegation of post-termination retaliation is the very definition of the "scintilla of evidence" which does not survive summary judgment. See Anderson v. Liberty Lobby, 477 U.S. 242, 252 (1986). Thus, Plaintiff has simply not provided this Court

with specific evidence of post-termination retaliation which would allow her claim to survive summary judgment.

## IV.   CONCLUSION

Upon the foregoing, the Court finds that Defendants are entitled to summary judgment. Because the Court grants summary judgment on Plaintiff's § 1983 First Amendment retaliation claim, the Court declines to exercise supplemental jurisdiction over Plaintiff's Georgia Whistleblower Claim, O.C.G.A § 45-1-4. See 28 U.S.C. § 1367(c)(3).

Accordingly, Defendants' Motion for Summary Judgment (Doc. no. 43) is **GRANTED.** The Clerk is **DIRECTED** to enter **FINAL JUDGMENT** in favor of Defendants. The Clerk shall terminate all deadlines and motions, and **CLOSE** the case.

**ORDER ENTERED** at Augusta, Georgia, this _62ᵗʰ_ day of February, 2009.

HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE